UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

Case No: 23-cr-20566
Hon. F. Kay Behm
U.S. District Judge

v.

LEWIS JAQUON NELSON,

Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS (ECF No. 29)**

## I.     PROCEDURAL HISTORY

This matter is before the court on Defendant Lewis Nelson's

("Nelson") Motion to Suppress (ECF No. 29).  On October 4, 2023, the

Government issued an indictment as to Nelson on a single charge: felon

in possession of a firearm under 18 U.S.C. § 922(g)(1), commonly

referred to as the federal "felon in possession" law (ECF No. 13).  Nelson

previously filed a motion to dismiss the indictment (ECF No. 36) on

March 13, 2024 under *New York State Rifle & Pistol Association, Inc. v.*

1

*Bruen*, 597 U.S. 1 (2022) and *United States v. Williams*, 113 F.4th 637, 662 (6th Cir. 2024), which this court denied (ECF No. 53).

Now before the court is Defendant's motion to suppress the gun found in his vehicle as the fruit of an unconstitutional search (ECF No. 29). The government responded (ECF No. 33). The court held an evidentiary hearing on April 9, 2025, at which one of the officers involved with the relevant traffic stop and search testified. The court ordered that any final arguments or supplemental briefs be filed by April 28, 2025. The government filed a supplemental brief (ECF No. 63); Nelson did not. Considering all the briefings, and two bodycam videos of the incident submitted under seal, the court **DENIES** Nelson's motion for the reasons below.

## II.   FACTUAL BACKGROUND

On or around July 31, 2023, at roughly 5:16 am, Flint Police Officers Osborn and Mays observed a gray Jeep Grand Cherokee driving with an expired registration. ECF No. 29, PageID.65. Defendant Nelson was later identified as the driver of the Jeep. *Id.*, PageID.66.

When he saw the police cruiser's lights, Nelson stopped in the middle turn lane and immediately placed his hands out of the driver's side window.  ECF No. 33, PageID.90.  The officers made contact with Nelson, and he was unable to produce a driver's license.  *Id.*  The officers then ran a search in the Law Enforcement Information Network (LEIN) and discovered that "defendant's license had been revoked and that he had valid outstanding warrants."  *Id.*  Nelson was subsequently removed from his vehicle, arrested, handcuffed, and placed in the back seat of the officers' cruiser.  *Id.*; ECF No. 29, PageID.65.

At that point, the officers performed a search of Defendant's vehicle.  ECF No. 33, PageID.90.  Defendant argues that the body cam video shows Osborn stating that the reason he is searching the vehicle is because Nelson's license was "suspended but when we pulled him over he gave us surrender hands out the window and he was acting really f****** nervous so I'm just gonna check it . . . because you don't just stick your f****** hands out the window for no reason."  ECF No. 29, PageID.65; *see* Osborn Bodycam at 4:53.

During the search of Defendant's vehicle, officers found "a loaded, stolen firearm in the trunk compartment area of the vehicle on top of

multiple bags of clothing.  The firearm was loaded with 14 rounds of

ammunition with one addition [sic] live round in the chamber."  ECF

No. 33, PageID.90.  There is no dispute that the search occurred

without a warrant.  *See id.* at PageID.92.

At the hearing, Officers Mays testified.  In addition to Officer

Mays' testimony, the government introduced three exhibits relevant to

this order: the Flint Police Department (Flint PD) impound policy (Ex.

3), the Flint PD impound and inventory search policy (Ex. 4), and the

impoundment and inventory record in this case (Ex. 5).  Flint PD's

policy on when police should impound unattended vehicles left on public

property generally states:

> **Any time a vehicle is rendered unattended**
> on public or private property not belonging to the
> vehicle owner or user **as a result of Flint police
> action, and custody of the vehicle is not
> turned over by the person in charge of the
> vehicle to another who is legally eligible to
> take charge, the vehicle shall be impounded
> for safekeeping**.  An alternative to
> impoundment may be arranged if the unattended
> vehicle is protected from theft or damage while in
> the custody of the Flint Police Department.  An
> alternative, to be acceptable, must transfer
> custody of the vehicle from the Department to the
> vehicle owner or his agent been discovered [sic].

Ex. 3 (emphasis added).

Further, "**[u]nattended vehicles which constitute traffic hazards**, or vehicles abandoned for 48 hours or more, **shall be impounded** as vehicles in Violation of Traffic Laws." *Id.* (emphasis added).

Flint PD's policy on conducting an inventory search on impounded vehicles states: "Any vehicle being impounded by the City of Flint Police Department will have an inventory search of the vehicle conducted prior to impound.  The inventory search will include the entire interior and exterior of the vehicle to include all compartments of the vehicle and any containers found therein."  Ex. 4.

The impound and inventory search slip, completed by Officer Mays, indicates that the personal property left in the car was "clothing in trunk, three cell phones in front of car, [and] misc lottery tickets." Ex. 5.  The vehicle was towed around 5:50 a.m.

## IV.   ANALYSIS

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV. Generally, the amendment requires a warrant for a search, supported

5

by probable cause, "describing the place to be searched, and the persons or things to be seized." *Id.*; *see also Illinois v. Gates*, 462 U.S. 213, 238-40 (1983).  This general requirement is subject to a number of exceptions in regard to automobiles, most relevantly here, the exceptions for inventory searches conducted pursuant to established policies and the inevitable discovery doctrine.  *See, e.g.*, *United States v. Alexander*, 954 F.3d 910 (6th Cir. 2020).

In a motion to suppress evidence obtained in an unconstitutional search, the burden of production and persuasion is first on the defendant who seeks to suppress.  *See United States v. Barber*, 887 F.2d 266 (6th Cir. 1989) (citing *United States v. Feldman*, 606 F.2d 673 (6th Cir. 1979), *cert. denied sub nom Zalmanowski v. United States*, 445 U.S. 961 (1980).  The standard of proof is preponderance of the evidence.  Once a defendant meets their burden, it shifts to the United States.  Ultimately, then, once a defendant raises legitimate arguments in favor of suppression, the Government bears the burden to show by a preponderance of the evidence that its search or seizure was reasonable.  *United States v. Vining*, 675 F. Supp. 3d 778, 785 (E.D. Mich. 2023) (citations omitted).

6

Nelson argues that the stop was unnecessarily prolonged, that the search was unjustified as a search incident to Nelson's arrest, and any "inventory" search was merely a pretext for an unconstitutional, warrantless investigative search.  The government responds that the vehicle was properly impounded after Defendant was arrested and an inventory search was conducted within constitutional bounds.  ECF No. 33, PageID.90.  In the alternative, they argue that the vehicle would have been subject to an inventory search regardless, even if the search as performed had constitutional deficiencies.  ECF No. 63, PageID.251.

The court agrees that the inventory search was constitutional, and that even if there were constitutional deficiencies, the gun would have been inevitably discovered.

## A.    Length of Stop

Nelson's first argument is that the stop was unjustifiably prolonged.  A seizure for a traffic violation justifies a police investigation of that violation, and officers can engage in "ordinary inquiries incident to the stop."  *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).  One of the inquiries of a traffic stop is "determining whether there are outstanding warrants against the driver."

7

*Rodriguez*, 575 U.S. at 355.  However, officers need reasonable suspicion of another crime to prolong the duration of a traffic stop beyond the time it takes "to address the traffic violation that warranted the stop" and "attend to related safety concerns." *Rodriguez*, 575 U.S. at 354; *United States v. Brewer*, 858 F. App'x 888, 889–90 (6th Cir., 2021).

Here, Officers Mays and Osborn stopped the vehicle Nelson was driving for an expired registration.  ECF No. 29, PageID.65; ECF No. 33, PageID.90.  When they spoke with Nelson and asked for his license and registration, Nelson was unable to produce a driver's license and indicated that it was suspended.  ECF No. 29, PageID.66; ECF No. 33, PageID.90.  The officers then ran a search in the Law Enforcement Information Network (LEIN) and discovered that "defendant's license had been revoked and that he had valid outstanding warrants."  ECF No. 33, PageID.90.  At that point, Nelson was arrested and placed in the back of the officers' vehicle.

Nelson does not dispute that there was a valid reason to conduct a traffic stop; instead, Nelson argues that the stop for driving without a license was unnecessarily prolonged because, essentially, Osborn had a

hunch that Nelson had contraband in the car after Nelson put his hands out of the driver's side window – but Osborn did not have reasonable suspicion to prolong the stop to investigate that theory under *Rodriguez*. *See* ECF No. 29, PageID.68.

However, an officer's discovery that the defendant was driving without a license "justifiably extend[s] the lawful scope of the traffic stop" because of the defendant's legal inability to remove the vehicle from the scene and the consequential need for a licensed driver or tow truck to do so. *United States v. Johnson*, No. 4:20-CR-40109-KES, 2021 U.S. Dist. LEXIS 52210, at *49 (D.S.D. Mar. 16, 2021) (citing *United States v. Soderman*, 983 F.3d 369, 374 (8th Cir. 2020), *United States v. Ovando-Garzo*, 752 F.3d 1161, 1164 (8th Cir. 2014))).  Here, the fact that Nelson was driving without a license justifiably extended the length of the stop, and the discovery that Nelson had outstanding warrants gave the police probable cause to arrest him.  There was no passenger who could have driven the car away.  In other words, even if the investigation of his traffic offenses was "over," Nelson would not have been able to leave.  *See, e.g.*, *United States v. Pritchett*, 749 F.3d 417, 437 (6th Cir. 2014) (holding that a "ten minute delay was not

9

unconstitutional because during the traffic stop Officer Hawes developed probable cause to arrest Rollins for driving without a valid driver's license"); *Johnson*, 2021 U.S. Dist. LEXIS 52210 (traffic stop not unreasonably extended by defendant's legal inability to remove the vehicle from the scene).  Any delay to the traffic stop here was not unconstitutional because during the traffic stop the officers developed probable cause to arrest or cite Nelson for driving without a license and/or for his outstanding warrants, and, because police had in fact arrested Nelson, the traffic stop would not have ended at that point.

## B.    Search Incident to Arrest

Nelson's second argument is that the search was not justified as a search incident to arrest.  ECF No. 29, PageID.68 (citing *Arizona v. Gant*, 556 U.S. 332 (2009)).  The government does not contest that point, and the court will not address it further.

## C.    Inventory Search

Nelson's third argument is that the search of his vehicle was not justified as an inventory search.  An inventory search is a well-defined exception to the warrant requirement of the Fourth Amendment, when not done merely for investigative purposes.  *Illinois v. Lafayette*, 462

10

U.S. 640, 643 (1983); *Colorado v. Bertine*, 479 U.S. 367 (1987).  "In conducting an inventory search, officers do not enjoy their accustomed discretion; they simply follow the applicable policy." *United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007) (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990) (stating that police must follow an established routine, not engage in "rummaging")).  "A vehicle can lawfully be in police custody even though it has not yet been towed to an impound lot if such actions reflect the inventory policy of the law enforcement agency. *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001).  "The search is unconstitutional if the evidence establishes that the police acted in bad faith or for the sole purpose of investigation in conducting an inventory search." *United States v. Snoddy*, 976 F.3d 630, 634 (6th Cir. 2020) (citing *United States v. Hockenberry*, 730 F.3d 645, 659 (6th Cir. 2013), *United States v. Vite-Espinoza*, 342 F.3d 462, 470 (6th Cir. 2003)) (cleaned up).  "In other words, officers cannot hide an investigative search under the pretext of an inventory search." *Id.*  "That said, 'the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search.'" *Id.*

Here, Officer Osborn suspected that contraband would be found in the vehicle. Little else can be reasonably concluded from his statement that, Nelson "was acting really f****** nervous so I'm just gonna check it . . . because you don't just stick your f****** hands out the window for no reason." ECF No. 29, PageID.71; Osborn Bodycam at 4:53-5:10. This raises the inference that the search may have been purely investigative in nature. The government in response produced Flint PD's policies on impoundment and inventory searches, as well as the record of the impoundment in this case. The question here turns on whether the government has shown, by the preponderance of the evidence, that although Osborn suspected contraband was in the car and hoped to search the vehicle, the impound and inventory search were nonetheless carried out according to established Flint PD policies.

Here, there were two applicable impoundment policies. First, "[a]ny time a vehicle is rendered unattended . . . as a result of Flint police action, and custody of the vehicle is not turned over by the person in charge of the vehicle to another who is legally eligible to take charge, the vehicle *shall* be impounded for safekeeping . . . ." Ex. 3 (emphasis added). This policy indicates that the officers had no discretion to allow

12

the vehicle to stay unattended in the center lane of the street, when there was no passenger who could have legally taken charge of the vehicle. The options available to Flint officers in this situation are, generally speaking, to either impound the vehicle or to "transfer custody of the vehicle . . . to the vehicle owner or his agent" while "the unattended vehicle is protected from theft or damage while in the custody of the Flint Police Department." Ex. 3. Nelson has not put forward any evidence that he offered to call the vehicle's registered owner or someone else to come pick up the car that morning. But to the extent that there may have been any discretion in that decision available to the officers — in other words, whether to allow Nelson to call the registered owner to come pick up the car at roughly 5:00 a.m., or to impound the vehicle as unattended once Nelson had been arrested – the limited extent of that discretion is generally permissible. *See Kimes*, 246 F.3d at 805 (discretion as to impoundment is permissible "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity"); *United States v. Hockenberry*, 730 F.3d 645, 660 (6th Cir. 2013) (officers acted within their discretion to impound a vehicle when

13

none of the vehicle's occupants were authorized to drive the vehicle); *but see United States v. Alexander*, 954 F.3d 910, 916 (6th Cir. 2020) (when the government cannot produce any "evidence of standardized criteria or established routine governing the scope of the inventory searches, [the court] must conclude that the searches were conducted with uncanalized discretion") (quoting citation omitted) (cleaned up).  Here, Flint PD policy only offers that alternative of "transferring custody" of unattended vehicles under their general policy regarding unattended vehicles; department policy as to vehicles specifically left out in traffic leaves no option to officers: "[u]nattended vehicles which constitute traffic hazards, . . . *shall* be impounded as vehicles in Violation of Traffic Laws."  *Id.* (emphasis added).  The decision to impound the vehicle in this case accorded with constitutional limits because the police's already limited discretion was further circumscribed; the standard criterion to be applied was that the vehicle was a traffic hazard once it was left unattended in the center of a road, which, under department policy, was sufficient to trigger the requirement to impound the vehicle as a matter of routine.

The only question left, then, is whether the actual search of the vehicle was an inventory search completed according to "applicable policy" and established routine, *see Tackett*, 486 F.3d at 232, or whether it was mere pretext for an investigative search.

Flint PD's standard procedure to conduct an inventory search is given in the government's Exhibit 4:

> A City of Flint Police Department Impound Slip will be completed by the impounding officer and signed by the person towing the vehicle from the scene.  The officer will ensure all sections of the Impound Slip are completed to include the impound number and reason for the tow.  If the vehicle is to be held as evidence for processing by the Identification Bureau, it will be noted at the top of the slip.  Any vehicle being impounded by the City of Flint Police Department will have an inventory search of the vehicle conducted prior to impound.  The inventory search will include the entire interior and exterior of the vehicle to include all compartments of the vehicle and any containers found therein.  All property in the vehicle will be recorded on the impound slip.  Any areas of the vehicle that are not searched will be noted on the Impound Slip.  The Impound Slip will be reviewed and initialed by a supervisor and turned in to the Identification Bureau by the impounding officer, prior to the end of the officer's shift.  Identification Bureau staff will update the status of the vehicle in LEIN by the end of the following day.

Ex. 4.

15

In this case, Mays filled out the impound slip, indicating that all of the interior and exterior of the car were searched.  Osborn's bodycam video also shows him searching the entire vehicle.  *See* Osborn Bodycam at 4:45 (driver's side front seat); 5:28 (driver's side backseat, including bags there); 7:20 (trunk, including discovery of the gun); 20:20 (returning to trunk, including search of plastic bags there); 22:10 (passenger side back seat); 22:36 (passenger side front seat).  The audio includes Osborn apparently talking to himself as he listed personal property he found in the vehicle to report to Mays (who was filling out the impound slip).  *See* Osborn Bodycam at 23:05 ("Four cell phones, multiple [inaudible]."); 23:20 (reporting back to Mays with his list, including "clothing in the back," "three cell phones,"[1] and "miscellaneous papers, lottery tickets.").  Those items were then reported by Mays in the impound slip after being relayed to her by Osborn.  *See* Ex. 5.

There are some discrepancies, but they do not rise to constitutional significance.  For example, the form was filled out by

---

[1] The discrepancy between the "four" and "three" cell phones is not explained, but does not appear to be important to this motion.

Mays, although Osborn did the actual search, but Mays' camera shows that Osborn relayed his actions and the items found to Mays as she filled out the form. *See, e.g.*, Mays Bodycam at 21:07. Mays, as the signing officer on the impound slip, ended up being the officer to meet the tow, which comports with Flint PD policy that the "Impound Slip will be completed by the impounding officer and signed by the person towing the vehicle from the scene." *See* Mays Bodycam at 33:50. The impound slip indicates that the "reason for impoundment" was Nelson being arrested for CCW, a charge that admittedly could not have arisen until the gun was discovered in the search of his vehicle – but again, the video shows that Mays was filling out the form as Osborn went back and forth from Nelson's vehicle to the police vehicle that Mays sat in while she filled out the form and supervised Nelson in the backseat. Further, while the officers sat in the car and filled out the forms, Osborn discovered evidence that the gun was stolen. Osborn Bodycam at 32:09. The fact that a new reason for arresting Nelson (and impounding the vehicle) arose during the search doesn't necessarily invalidate the impoundment itself when, as here, there was already an existing, independent basis for doing so. Finally, at the hearing, Mays

17

testified that Osborn's search of the trunk was done prior to the actual inventory search being completed – but it is not clear that she can speak for Osborn (who was actually completing the search) and that he understood that to be the case. In the video, when another officer asks Osborn whether he's searching the car, Osborn says "yeah, just the inventory," Osborn Bodycam at 5:18 (before searching the trunk), which indicates that his contemporaneous understanding of the situation was that he was performing an inventory search. Nelson was handcuffed in the back of the police cruiser when the search began. The search began after officers were aware his license was suspended. This evidence tends to indicate that, while certain aspects of the search may raise an initial question of whether the search complied with standard procedure, and Osborn undoubtedly made comments which raise a question of pretextual motive, on complete review of the incident the search only began after it was clear that Nelson could not drive the car away and that the now-unattended vehicle was a traffic hazard. Thus, the search was within the standards for inventory searches on impounded vehicles set forth in Flint PD policies. Under *Snoddy*, no constitutional deficiency exists when, as here, the relevant inventory

search is performed in accordance with standard procedure, even if police admittedly hoped to find contraband.

## D.   Inevitable Discovery

Finally, the government contends that even if Officer Osborn searched the car unconstitutionally, the gun would have been inevitably discovered because the officers would have completed an inventory search prior to towing the vehicle anyway.  Nelson did not address this in his initial brief, nor did he file a supplemental brief addressing this possibility, but the court nonetheless agrees with the government that the evidence would have been discovered in an inventory search even if there are questions as to the constitutionality of the search as conducted.

In *Nix v. Williams*, the Supreme Court adopted the inevitable discovery doctrine as an exception to the exclusionary rule.  467 U.S. 431, 443 (1984).  "The inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source."  *United States v. Cooper*, 24 F.4th 1086, 1091 (6th Cir. 2022) (cleaned up).  It is the Government's burden to show, by a preponderance of the evidence, "that the [evidence]

19

ultimately or inevitably would have been discovered by lawful means . . . ." *Nix*, 467 U.S. at 444.

The Sixth Circuit has outlined two scenarios where the inevitable discovery exception applies. *See Cooper*, 24 F.4th at 1091. First, the exception applies when "an independent, untainted investigation" was bound to uncover the evidence. *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995). Second, the inevitable discovery exception applies "when other compelling facts demonstrate that discovery was inevitable." *Cooper*, 24 F.4th at 1091 (internal quotations omitted). The government bears the burden of showing that the exception applies. *Nix*, 467 U.S. at 444; *United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008). While answering the hypothetical posed by the doctrine inherently requires some conjecture, *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996), courts must "keep speculation at a minimum by focusing on 'demonstrated historical facts capable of ready verification or impeachment.'" *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999) (quoting *Nix*, 467 U.S. at 444 n.5). The Sixth Circuit has held that a standard inventory search before towing a vehicle is a routine practice that requires little guesswork and is generally covered

by the second category of the inevitable discovery exception.  *United States v. Cooper*, 24 F.4th 1086, 1094 (6th Cir. 2022) (citing *United States v. Pritchett*, 749 F.3d 417, 437 (6th Cir. 2014); *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001)).

The questions for the court to answer in this case, and for the government to prove, are the following: if the illegal search had never happened, would Mays and Osborn have impounded the vehicle?  And would the ensuing inventory search have led to the discovery of the gun?  The inevitable discovery exception applies only if the answer to both questions is "yes."  *Cooper*, 24 F.4th at 1096.  Assuming, arguendo, that the search could have been illegal, that is the case here.

The court has already concluded that the vehicle was properly impounded, and here can safely conclude that it would have been impounded in any situation.  Mays testified that she would not have allowed the car (which had been stopped in the middle of the road, while Nelson had been arrested) to remain in a lane of traffic, and would have impounded it.  There was also no passenger who could have driven the car away, and Flint PD's policy did not require police to try and contact the vehicle's owner rather than impound it.  Ex. 3.

As to whether the vehicle would have been searched anyway, Flint PD's policy on conducting an inventory search on impounded vehicles states: "Any vehicle being impounded by the City of Flint Police Department *will* have an inventory search of the vehicle conducted *prior* to impound." Ex. 4 (emphasis added). In light of this standard policy requiring an inventory search be conducted on an impounded vehicle prior to being towed, Mays' testimony that the vehicle had to be inventoried under these circumstances is credible, and no evidence has been presented to suggest that this would not have occurred. And given the gun's location in the trunk on top of bags of clothing, there is no evidence suggesting that the gun would not have been discovered in an ordinary inventory search upon impounding the vehicle.

The government has presented sufficient evidence to conclude that the vehicle would have been impounded and properly inventoried even if Osborn's search had constitutional deficiencies. *See, e.g., United States v. Arnold*, No. 19-20193, 2019 U.S. Dist. LEXIS 177868, at *24 (E.D. Mich. Oct. 15, 2019) (Where neither occupant of a car had a driver's license, and decision to impound would have been valid because car was in road and traffic hazard, finding inevitable discovery applied

22

because "[e]ven if Officer Roberts had not searched the glovebox

illegally, that compartment eventually would have been opened,

searched, and inventoried, and the gun . . . would have been found.").

Therefore, the inevitable discovery exception applies.

## V.   CONCLUSION

For the reasons stated above, the court **DENIES** Defendant's

Motion to Suppress (ECF No. 29).

**SO ORDERED**.


Date: May 20, 2025                    <u>s/F. Kay Behm</u>
                                      F. Kay Behm
                                      United States District Judge